# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# NORTHERN DIVISION

| | | |
|---|---|---|
| **PAMELA J. BRITTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:09CV50MLM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue ("Defendant") denying the applications for Disability Insurance Benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 401 et seq. filed by Plaintiff Pamela Britton ("Plaintiff").

Plaintiff filed a Brief in Support of the Complaint. Doc. 11. Defendant filed a Brief in Support of the

Answer. Doc. 14. Plaintiff filed a Reply. Doc. 15. The parties have consented to the jurisdiction of

the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Doc. 6.

## I.

## PROCEDURAL HISTORY

On November 15, 2006, Plaintiff filed an application for disability insurance benefits alleging

a disability onset date of August 3, 2004. Tr. 18, 104-106. Plaintiff's claim was initially denied on

January 23, 2007, and she filed a request for hearing before an Administrative Law Judge ("ALJ").

Tr. 63, 71-75. A hearing was held before an ALJ on May 8, 2008. Tr. 19-62. By decision dated

January 29, 2009, the ALJ found Plaintiff not disabled. Tr. 6-18. The Appeals Council denied

Plaintiff's request for review. Tr. 1-3. As such, the decision of the ALJ stands as the final decision

of the Commissioner.

## II.

## MEDICAL RECORDS

John Beckert, D.O., reported, on February 10, 1999, that Plaintiff presented with lower back pain; that Plaintiff did a lot of stooping, bending, and lifting; that, at the time of Dr. Beckert's examination, Plaintiff was "post surgical about a year"; that Dr. Beckert was "sure" Plaintiff's stooping, bending, and lifting "aggravate[d] her post disk surgery syndrome"; and that Dr. Beckert told Plaintiff "to stay off work until Monday, to rest, and not to do any lifting, bending, or stooping." Tr. 280.

Dr. Beckert's July 30, 2003 notes reflect that Plaintiff presented with back pain which went down her left leg; that she had a previous surgery at L5, S1 performed in 1997 by Ernest Found, M.D.; that "an OMT was administered with fair results"; that Plaintiff was treated "with Lorcet, and Skelaxin, and Celebrex"; and that Dr. Beckert's clinical impression was that Plaintiff had "a disc problem involving L4 and L5 on the left side." Tr. 224.

Dr. Beckert's August 1, 2003 notes reflect that Plaintiff presented on this date and told him that, on July 27, 2003, at work, "she started having pain in her leg and it [] significantly worsened at this time." Dr. Beckert further reported on this date that his clinical impression was that Plaintiff "has quite possibly a herniated disc at the level of L 3 and L 4 on the left side." Tr. 223.

An August 5, 2003 Radiology Report, prepared by Darrel Anderson, M.D., of the Quincy Medical Group, states that Plaintiff had a "mild narrowing of the lumbosacral interspace," and that "the lumbar vertebrae and intervertebral disk spaces [were] otherwise unremarkable." Tr. 305.

Dr. Jacobs of the Quincy Medical Group reported, on August 5, 2003, that Plaintiff presented and stated that "she was seen by Dr. Beckert and given a treatment and some medication"; that "the medication tended to make her sick to the stomach"; that "she has continued to have some discomfort

in her low back that [went] down the left leg"; and that "she [was] doing a little better but she is still having some discomfort, particularly when she moves about and walks." Dr. Jacob's report of this date further stated that an x-ray "show[ed] degenerative disk disease at the L5-S1 interspace"; that there was "low back pain-radiculopathy"; that Plaintiff was "to continue to rest and take it easy"; and that, "as the Vicodin made her sick to her stomach," she would be given Naprosyn. Tr. 298. A Quincy Medical Group Work Ability Report from this same date states that Plaintiff should not return to work until she was seen on Friday. Tr. 285.

Dr. Jacobs reported, on August 8, 2003, that Plaintiff presented and said that her low back pain was "just not any better"; that the pain was not keeping her awake; and that "she was told at the casino [where she worked] that there was really no such thing as light duty and she need[ed] to get full release and resolution to this." Dr. Jacob's report stated that he "would have her go back to light duty"; that "hopefully they [would] have something for her"; that Plaintiff was to continue her medications of Naprosyn and Skelaxin; and that he would start Plaintiff on physical therapy. Tr. 297. A Quincy Medical Group Work Ability Report from that same date states that Plaintiff could return to work on "Friday" with the following restrictions: no work requiring repetitive bending of the low back, no lifting over 15 pounds, no push or pull over 25 pounds of force, and light duty. Tr. 286.

Dr. Wilson, of the Quincy Medical Group, reported, on August 12, 2003, that Plaintiff said that "she was denied light duty at work. Dr. Wilson's report of this date states that "the back ha[d] some minimal tenderness along the lumbosacral area"; that Plaintiff had started physical therapy; and that "if [Plaintiff] goes to physical therapy she will probably improve." Tr. 295-96. A Quincy Medical Group Work Ability Report of that same date states that Plaintiff could return to work on "8/12/03" with the following restrictions: no climbing of ladders, no work requiring repetitive bending of back, no lifting over 15 pounds, and no push or pull over 25 pounds of force. Tr. 289.

On August 26, 2003, Dr. Wilson reported that Plaintiff said that "her pain and her discomfort [had] improved by 80% with the physical therapy"; that "the pain in her left leg [was] resolved completely"; that "she [was] moving about much better and is able to bend some"; and that "the company did find light duty for her and she [was] very happy about this." Dr Wilson's report further stated that Plaintiff's low back strain was improving; that her left leg pain was resolved; and that Plaintiff was to continue physical therapy, finish out on her medications, and continue present light duty. Tr. 294. A Quincy Medical Group Work Ability Report of that same date states that Plaintiff could return to work with the following restrictions: no climbing of ladders, no work requiring repetitive bending of back, no lifting over 15 pounds, and no push or pull over 25 pounds of force. Tr. 292.

A September 15, 2003, a Discharge Summary from Leslie Winters of Priority Physical Therapy states that Plaintiff had 12 physical therapy treatments from August 11, 2003, to September 15; that Plaintiff "made very good progress with physical therapy"; that Plaintiff "improved by approx. 70% per patient report"; that Plaintiff was "instructed to continue with proper positioning to prevent re-injury of back and increase low back strength"; that Plaintiff achieved the goal "to rate worst pain as less than or equal to a 2/10"; that Plaintiff achieved the goal "to report no numbness or tingling in the left leg"; that Plaintiff achieved the goal "to be independent with Home Exercise Program"; that Plaintiff partially achieved the goal "to perform all work duties without increase in pain"; and that Plaintiff "achieved or partially achieved all goals due to decrease in pain, increase in function and independence in Home Exercise Program." Tr. 300.

On September 16, 2003, Dr. Wilson reported that Plaintiff "had a left back sprain and left leg pain that resolved," and that Plaintiff was released to usual duties at work. Tr. 293. A Quincy

Medical Group Work Ability Report of that same date states that Plaintiff could return to work on "9/16/03" with no restrictions indicated. Tr. 290.

Pharmacy records reflect that, on November 26, 2003, Plaintiff was prescribed a 3 day supply of Apap-Codeine; that, on May 26, 2004, Plaintiff was prescribed a 3 day supply of Hydrocodone-Acetaminophen; that, on October 23, 2004, Plaintiff was prescribed a 3 day supply of Apap-Codeine; that, on December 22, 2004, Plaintiff was prescribed a 7 day supply of Hydrocodone-Acetaminophen; and that on February 1, 2005, Plaintiff was prescribed a 3 day supply of Apap-Codeine. Tr. 189-90.

Dr. Beckert reported, on *August 4, 2004, that Plaintiff said that she hurt her back at the casino* while restocking slot machines.[1] Dr. Beckert's notes reflect that an "OMT to the dorsal and cervical lumbar area was administered [to Plaintiff] with satisfactory results." Tr. 219.

Dr. Beckert's notes of August 7, 2004, reflect that Plaintiff said that she had "persistent pain in her back" and "pain down her right leg." Dr. Beckert's notes further state that his clinical impression was that Plaintiff "has a herniated disc problem." Tr. 220.

Dr. Found, of the University of Iowa Hospital and Clinic, reported, on October 14, 2004, that Plaintiff presented and stated that she developed lower back pain on August 2, 2004; that her family physician recommended her being off work and then light duty; that she had pain after prolonged sitting or standing activities; that she had a muscle injection of steroids which "gave her relief for a short time, however, her symptoms [had] since returned"; and that she returned that day "suspecting that she has a herniated disc like she did in the past." Dr. Found's report states that Plaintiff had "back pain continuously and it [was] somewhat bothersome"; that Plaintiff's right leg had "pain most of the time [that is] moderately bothersome, [and there was] numbness and tingling a good bit of the time [that was] moderately bothersome, and weakness a good bit of the time [that was] somewhat

---

[1]     This is Plaintiff's first visit to a doctor after her alleged onset date of August 3, 2004.

bothersome"; and that Plaintiff's left leg had "no pain, no numbness or tingling, and no weakness." Dr. Found's report states that Plaintiff could only lift light objects and that pain prevented her for walking, sitting, or standing for more than one hour. Dr. Found further reported that pain occasionally interrupted Plaintiff's sleep. Tr. 267.

Dr. Found further reported, on October 14, 2004, pursuant to physical examination of Plaintiff, that Plaintiff was able to heel and toe walk without difficulty; that "trunk flexion in standing [was] normal without discomfort"; that "extension in standing [was] normal with some pain in the right buttock"; that "knee and ankle tendon reflexes [were] 2+ and symmetrical"; and that Plaintiff's AP and lateral flexion/extension films of the lumbar spine were "essentially negative" and that there was some narrowing of the L5-S1 disc space. Dr. Found's report states that Plaintiff's physical exam "did not reveal positive neurologic findings in the lower extremities indicative of radiculopathy"; that Plaintiff had "right-sided trochanteric bursitis and gluteal strain"; and that Plaintiff was "instructed in a home physical therapy program that involved the use of cold packs [and] specific hip abductor strengthening exercises." Tr. 269.

Dr. Beckert reported, on December 22, 2004, that Plaintiff "did not appear to be in any acute distress"; that an "OMT to the dorsal and cervical lumbar area was administered with satisfactory results"; that Plaintiff "ha[d] significant pain in the lumbosacral area"; that Plaintiff "ha[d] a marked amount of pain with bending, stooping and lifting"; that the doctor discussed "the possibility of going back to see Dr. Found if [Plaintiff] [did] not improve"; that Plaintiff received a steroid injection of Flexaril and was given Lorcet and Voltaren for pain; and that Plaintiff would "be seen routinely for follow up care." Tr. 216.

On February 9, 2006, Jerome Levy, M.D., evaluated Plaintiff for a worker compensation claim. Dr. Levy's report of this date states that Plaintiff related that, on July 28, 2003, she was

"pulling a heavy load of coins when she had immediate pain in her low back"; that she felt the pain radiating down her right leg from the back into the hips"; that she "sought medical attention and was treated conservatively"; that she "also was sent to physical therapy and the back to work"; that she had missed about three weeks"; that she "continued to do the work at the Casino, including lifting bags of money, etc, and continued to have some discomfort in her back"; that she was "doing this type of work on August 2, 2004 when her back pain markedly exacerbated with pain going down the right leg"; that "she was off for a week and then was fired"; that she "again was treated and had x-rays"; that she "has been interviewing for other jobs, but with the 40-pound weightlifting restriction she ha[d] been given by her doctors, it ha[d] been very difficult for her to find a position and [she was] now not working." Tr. 312. Dr. Levy noted that Plaintiff related that "she continue[d] to have pain in her back whenever she [did] any lifting, even relatively light amounts."

Pursuant to his conducting a physical examination of Plaintiff, Dr. Levy reported that Plaintiff "ha[d] a normal gait and [was] able to walk on heels and toes without limping and without difficulty"; that "squatting [was] performed without difficulty"; that "there [was] no obvious deformity noted" in Plaintiff's back; and that she had limitation of motion and "moderate discomfort" in her back; that there was no muscle spasm; that "the lumbodorsal curvature [was] normal"; and that "there [was] no sciatic notch tenderness"; that "no obvious deformity [was] seen in the lower extremity"; that "all joints move[ed] through a full range of motion"; that "there [was] no discomfort on any of these motions"; that "no joint instability [was] noted"; that "no grating on motion of any joint [was] noted"; that "straight leg raising [was] negative bilaterally"; that "there [was] no measurable atrophy"; that "there [was] no weakness in the lower extremities"; that "sensory examination to pin prick and touch [was] normal"; that "deep tendon reflexes [were] equal and active bilaterally." Dr. Levy opined that, "based upon a reasonable degree of medical certainty," it was his opinion that as a result of the

accidents of July 28, 2003 and the re-injury on August 2, 2004, Plaintiff had a permanent partial disability of "Twenty percent (20%) of the woman as a whole due to her back." Dr. Levy further opined that Plaintiff had "a permanent partial disability pre-existing the accident of July 28, 2003; that Plaintiff's disability was "a hindrance and obstacle to employment and to re-employment should [s]he become un-employed"; and that Plaintiff had an "overall disability" which was forty percent "of the woman as a whole due to her back." Dr. Levy recommended that Plaintiff see her treating physician for the purpose of having an MRI to determine the exact pathology causing her problems. Tr. 312-15.

November 16, 2006 records from Dr. Beckert's office[2] state that Plaintiff was having problems with continued back pain; that she has taken up to 12 aspirin a day; that "the pain has not gotten any better"; and that she wanted "to go down to Columbia Orthopedic Group for a 2nd opinion." Upon examination, it was reported that Plaintiff had "decreased range of motion in flexion, extension, side bending and rotation of the lumbo thoracic spine"; that she had "exquisite tenderness to palpation over the perispinal musculature on the right in her lumbar spine"; that her DTRs [were] +2/4 equal and symmetric bilaterally"; and that she had "a positive straight leg raise test." Tr. 200.

A November 22, 2006 radiology report states that Plaintiff had an X-ray of her lumbar spine and that the x-rays showed that Plaintiff's posterior elements, bony sacrum, and sacroiliac joints appeared normal; that there was normal bony architecture and density with minor endplate deformities through the lumbar spine with sparing at L-2; that there were minor arthritic changes in the endplates in the lower dorsal vertebra; and that there was no fracture, spoldylolysis, or spondylsisthesis. Tr. 201.

---

[2] It is unclear if, on this date, Plaintiff was seen by Dr. Beckert or by Brigitte Cormier, D.O.

Also, on November 22, 2006, Plaintiff had MRI examinations of her "L-spine." Reports from these examinations state that disc dehydration was "demonstrated at L5-S1 with a uniform disc herniation identified"; that the posterior longitudinal ligament appeared intact; that there was "minimal bulge at L2-3 and disc dehydration"; that "Schmorl's nodes [were] demonstrated in the L1, L2, and L3 vertebra; that "the spinal cord end[ed] at L1-2 demonstrating a homogeneous signal intensity to the conus medullaris"; that the neural foramina were "patent bilaterally"; and that there was "encroachment on the left at L4-5 ... by disc material," which was less severe on the right. The MRI reports further state that there was "evidence of central disc herniation at L5-S1"; that there was "evidence of postsurgical changes at the left L5-S1 region due to left hemi-laminecotomy and medial facetectomy"; that there were "postsurgical changes to the perineural sheath of the left S1 nerve root"; that there was "central disc herniation"; that there was "no encroachment to the right S1 nerve root"; and that "the nerve roots L1 through L5 and the first sacral vertebra [were] unremarkable on the right." Tr. 201-204.

On December 6, 2006, Sandra Tate, M.D., of the St. Louis Orthopedic Institute, evaluated Plaintiff for "the purpose of an independent medical evaluation only and not as a treating physician." Dr. Tate reported that she reviewed Plaintiff's medical records; that Plaintiff said that her pain was "at least 7/10, and was at most 9/10," that she was "able to perform her self-care if she [was] slow and careful," and that she could not "lift or carry anything"; that Plaintiff also said that she was taking Vicodin and Cymbalta; that Plaintiff said she smoked "about a pack per day and ha[d] smoked for 18 years"; that Plaintiff was "a well-nourished, well-developed female in no acute distress"; that she was alert and oriented; that she was 5' 3" tall and weighed 220 pounds; that she had a "flat affect" and "very pressured speech"; that her "neck is supple"; that there was "no paravertebral muscle spasm or tenderness"; that "cervical range of motion [was] intact"; that formaminal encroachment was

negative bilaterally; "no trigger points [were] identified"; and that "Adson's and hyperabduction maneuvers [were] negative bilaterally." Dr. Tate further reported that Plaintiff's "shoulders reveal[ed] no rotator cuff tenderness; that Plaintiff had normal range of motion in the shoulders, elbows, and waist; that her muscle strength was "5/5 throughout"; that there was "no increased pain with resisted abduction or external rotation"; that there was "no instability in the shoulders, elbows, or wrists"; that there was no tenderness to palpation; that "impingement sign, drop arm and apprehension maneuvers [were] all negative"; that the examination of lumbosacral spine "reveal[ed] tenderness [] over the lumbosacral junction"; that "forward flexion [was] 80 degrees"; that "extension [was] to neutral, but this [was] inconsistent as [Plaintiff] could get 20 degrees of extension in a prone-on-elbows position"; that straight leg raising was "negative to 90 degrees in sitting and lying position"; that Waddell symptom magnification indicators were "positive for increased pain with en bloc rotation, increased pain with axial loading, diffuse tenderness, distraction maneuvers and pain out of proportion to objective findings"; that muscle strengths of the lower extremities was "at least 4/5"; that Plaintiff's "gait [was] within normal limits"; that Plaintiff was "able to ambulate without specific deficits"; and that there were "no coordination deficits." Dr. Tate stated that, in her opinion, Plaintiff "did not have specific injuries on 07/28/03 or 08/02/04 and her work activities were not a prevailing cause of her current symptoms"; that "instead [Plaintiff] ha[d] ongoing degenerative disk and joint changes"; that "her clinical exam [did] not show any evidence of radiculopathy"; that "within a reasonable degree of medical certainty [Dr. Tate found Plaintiff] to be at maximum medical improvement"; and that Plaintiff could "currently work within the 40-lb permanent restriction that she had been given previously." Tr. 333-36.

On January 23, 2007, K. Bax, a State agency medical consultant, completed a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff. The RFC Assessment states that

Plaintiff alleged disability due to back and hearing loss; that Plaintiff's 2006 MRI "however does not objectively explain [Plaintiff's] symptoms"; that Plaintiff had "decreased ROM, tenderness to palpation and positive SLR's"; that from "AOD to present, she ha[d] only reported back symptoms a total of three times to her TP"; and that on Plaintiff's "ADL form she report[ed] doing activities such as performing all self-care tasks without difficulty, preparing simple meals, do[ing] light cleaning, driv[ing] a car, go[ing] shopping 1-2 times a week, read[ing], [and] watch[ing] TV" and that she could "lift 30 lbs, and walk 2 blocks." Tr. 65-67.

The Physical RFC Assessment further states that Plaintiff can "occasionally" lift and/or carry twenty pounds, stoop, kneel, crouch, and crawl, and climb ramps and stairs; that she can "frequently" lift and/or carry 10 pounds; that she can stand and/or walk for a total of at least 2 hours in an 8-hour workday; that she can sit for a total of about 6 hours in an 8-hour workday; that she can "never" climb ladders, ropes, and scaffolds; and that Plaintiff should "avoid concentrated exposure" to vibrations and hazards and indicated no manipulative or visual limitations. The RFC Assessment additionally states that Plaintiff has "RFC for sedentary work"; that "based on her physical restrictions…she cannot return to her past work"; that "she is able to perform other types of work that are less demanding"; that "occupations [Plaintiff] retains the ability to perform include "surveillance system monitor (government service)", "call-out operator (retail trade)", and "weight tester (recycling)"; and that "these jobs exist in sufficient numbers in the national economy to be a viable alternative of work that [Plaintiff] can perform." Tr. 65-70.

On June 10, 2007, Dr. Levy reported that he had reviewed Plaintiff's November 22, 2006 MRI and that his diagnosis of Plaintiff included a "history of diskectomy, l5, S1, old," "possible recurrent disk herniation, low lumbar area," and "lumbosacral strain, chronic." Dr. Levy's report further states, "based upon a reasonable degree of medical certainty," that, as a result of the accidents

of July 28, 2003 and the re-injury on August 2, 2004, Plaintiff had a permanent disability of "[t]wenty percent (25%) [sic] of the woman as a whole due to her back." Dr. Levy further opined that Plaintiff had a permanent partial pre-existing disability of "[t]wenty percent (20%) of the woman as a whole due to her back." Tr. 316.

Dr. Beckert's notes of July 3, 2007, reflect that Plaintiff complained of "pressure in bladder, lower back pain, and abd[ominal] pain." Tr. 327.

The Clark County Pharmacy Customer History Report recorded that, on July 10, 2007, Plaintiff was prescribed a 30 day supply of Hydrocodone-Apap; that, on December 10, 2007, Plaintiff was prescribed a 4 day supply of Apap-Codeine; that, on February 19, 2008, Plaintiff was prescribed a 30 day supply of Hydrocodone-Apap; and that, on May 7, 2008, Plaintiff was prescribed a 30 day supply of Hydrocodone-Apap. Tr. 191-192.

Dr. Beckert's February 19, 2008 notes reflect that Plaintiff complained of back pain, abdominal pain, and a bladder infection on this date; that she stated that she needed a refill for some of her medication; that Plaintiff was assessed with UTI, abdominal pain; and that Plaintiff was given a "refill on routine medication." Tr. 330.

On May 6, 2008, Dr. Beckert evaluated Plaintiff and prepared a "medical statement regarding physical abilities and limitations for Social Security disability claim." Dr. Beckert's evaluation states that the following were present on examination or testing of Plaintiff: neuro-anatomic distribution of pain; limitation of motion of the spine; motor loss; sensory or reflex loss; positive straight leg raising test; severe burning or painful dysesthesia; the need to change position more than once every two hours; and lumbar spinal stenosis; "minor arthritic changes to the lumbar spine"; and "some degree of spinal stenosis with a significant positive straight-leg raising test on her right side." Dr. Beckert reported that, in his medical opinion, Plaintiff could work 1 hour per day; that she could stand 15

minutes at one time; that she could stand 60 minutes in a workday; that she could sit 30 minutes at one time; that she could sit 60 minutes in a workday; that she could lift 10 pounds on an "occasional basis"; that she could do no lifting on a "frequent basis"; that "occasionally" she could bend, stoop, and balance; that she could "never" work around dangerous equipment; that she could "occasionally" operate a motor vehicle; that she had limited hearing; that, during an 8 hour workday, Plaintiff needed to elevate her legs most of the time; that Plaintiff suffered from pain that was severe; and that Dr. Beckert's clinical impression was that Plaintiff "probably need[ed] to have a complete work up done to reassess her back and determine whether or not she is employable" and that "in her current condition [Plaintiff was] not an employable candidate at this time." Tr. 338-41.

On September 12, 2008, Kelly David Halma, D.O., evaluated Plaintiff and prepared a Disability Physical Examination Report. Dr. Halma's report of this date states that Plaintiff complained of low back pain, migraine headache pain, and ringing in her ears; that he reviewed Plaintiff's medical records; that she had "right lower extremity pain to her knee and to her calf intermittently"; that Plaintiff described the pain "as constant dull ache in the low back, lumbosacral region"; that Plaintiff said that she "has numbness all the way down the leg on the right," " muscle spasms in the back intermittently," and "pain down her left leg but stopping more at the knee"; that Plaintiff said that Vicodin relieved her pain and that prolonged walking, prolonged standing, prolonged sitting, lying on her side, back, extreme cold, getting out of the car, and prolonged riding prolonged or increased her pain. Dr. Halma's report states that Plaintiff could walk a block; that she could "only walk for 15 to 30 minutes"; that she could "lift 15 lb. in either hand"; that could "ride for sixty minutes"; that she could "stand for 15-30 minutes and sit 30-45 minutes"; and that drove "herself two times per week." Dr. Halma reported, pursuant to his physical examination of her, that Plaintiff had a blood pressure of 128/70; that Plaintiff's height was five feet two and a half inches; that

her weight was 222 pounds; and Plaintiff has a BMI of 40, indicating obesity; that Plaintiff was alert and oriented; that she appeared to be in no acute distress, "however she [] mildly rock[ed] from side to side likely to relive her pain"; that she "also ha[d] some increased facial grimacing with pain"; that she "appear[ed] uncomfortable after sitting approximately fifteen minutes"; that she was "not able to stand erect and flexes approximately 15 degrees when standing"; and that she "need[ed] both her hands to get out of the chair." Tr. 347-49.

Dr. Halma also reported that, in regard to her gait and balance, Plaintiff was "steady in tandem walk but avoid[ed] putting pressure on her right leg and [could] complete about six steps"; that Plaintiff had "difficulty walking heel to toe and [was] unsteady bilaterally"; that "standing on one leg [was] steady bilaterally and she need[ed] assistance for balance"; that she was "able to lift the leg greater than 90 degrees and [got] the right to approximately 90"; that going up and down an 8" step was unsteady with the right being greater than the left." Dr. Halma further reported that Plaintiff was "able to follow commands and understand conversational voice without difficulty but my voice did have to be slightly louder and she [did] speak slightly louder but not too extreme"; that extraocular muscles were intact; that pupils are equal and reactive to light and accommodation"; that Plaintiff's "DTR's were +2 over 4 in the upper and lower extremities"; that her "fine motor coordination and other fine motor skills were intact bilaterally"; that she had some decreased sensation; that Plaintiff "has no difficulty placing her hands behind her head and keeping her elbows in the coronal plane; however, reaching behind her back bilaterally she was slow and was unable to touch her hands together"; that shoulder strength was 5 out of 5 and "no special tests were performed"; that elbow strength is 5 out of 5; that elbows have the "full range of motion"; that hand and wrist strength was slightly decreased with increased give away strength in wrist flexion"; that "finger flexion strength was 5 out of 5; that thumb to first finger strength was 5 out of 5; that thumb to fourth finger strength

bilaterally was 4 out of 5; that grip strength was 4 to 5; and that Plaintiff had slow onset of gripping or was slow to reach full grip. Tr. 349-50.

Dr. Halma's report continued to state that Plaintiff had "decreased strength in hip flexion, extension, and internal rotation and 'give away' strength with abduction and adduction; that she had "pain with hip extension bilaterally"; that "seated straight leg raising was positive for low back pain with radiculopathy down to the knee going posteriorly past it but definitely not down to the ankle or toes along a posterior route"; that there was "about 80 degrees of flexion of the hips, not exactly conclusive for radicular but more suggest[ive] [of] a possible impingement"; that "supine straight leg raising with hip flexed to 90 extending the knee to full was positive only on the right and going and going past the knee but not to the ankles"; that "McMurray's Test for meniscal tears was positive bilaterally suggestive more of the medical meniscus"; that Plaintiff "showed signs of being uncomfortable in the prone position after approximately ten minutes"; that "backward bending test was positive for pain and asymmetry with backward extension being about 10 degrees"; that "cervical distraction or decompression test was slightly positive on the left indicating that it decreased her radiculopathy"; that "radiculopathy was not present without compression"; that "lordosis of the cervical spine and thoracic spine was normal"; and that "there was no evidence of scoliosis in the cervical, thoracic, or lumbar spine." Tr. 350-51.

Dr. Halma assessed Plaintiff's ability to lift and carry a box weighing approximately eight and a half pounds, at table height. Dr. Halma's reported that Plaintiff "displayed good initial effort but was unable to continue after trying to lift [the box] one or two times"; that she "raised it approximately one, possibly two inches"; that she "was able to get it to at least her waist level with both hands"; and that at this point "she was unable to continue and terminated the test." Dr. Halma also assessed Plaintiff's ability to pick an object up from the floor and reported that Plaintiff "had initial good effort

but was unable to reach it after three attempts," and that "from the sitting position and reaching down for the pen, she was 5 inches away from the floor." Tr. 351, 255.

Based on a review of Plaintiff's previous medical records and his assessments, Dr. Halma concluded that Plaintiff had "low back pain secondary to degenerative disc disease with positive history of L5-S1 involvement," "right knee pain, possible degenerative joint disease," "muscle spasms in the hamstrings bilaterally," "morbid obesity with BMI greater than 40," and a "history of carpal tunnel syndrome with the right being greater than the left." Dr. Halma further found that Plaintiff had a hearing impairment; that Plaintiff retained the ability to hear and understands simple oral instructions; that others "may have to use a loud voice at times" when speaking with Plaintiff; that Plaintiff could sit 20-30 minutes at one time without interruption; that she could stand 15-30 minutes at one time without interruption; that she could walk 15-30 minutes at one time without interruption; that she could sit 3 hours total in an 8 hour work day; that she could stand 2 hours total in an 8 hour work day; that she could walk 2 hours total in an 8 hour work day; that Plaintiff should "never" climb ladders or scaffolds, crouch, and crawl; that Plaintiff could "occasionally" climb stairs and ramps (with limitations on the number of steps), balance, stoop and kneel on her left knee; that Plaintiff should avoid kneeling on her right knee; that Plaintiff could "never" tolerate exposure to unprotected heights or vibrations; that she could "occasionally" tolerate exposure to humidity and wetness, extreme cold, and extreme heat; and that she could "frequently" tolerate exposure to moving mechanical parts and operating a motor vehicle. Tr. 351-59.

### III.

### LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to

meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities…." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d at 430-31).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity ("RFC"). Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual

functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC"). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v.

Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("review of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022.  See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and

impairment;

       (5) The corroboration by third parties of the claimant's physical impairment;

       (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

       (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

       Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

       The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

       "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

       (1) the claimant's daily activities;

       (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

       (3) any precipitating or aggravating factors;

       (4) the dosage, effectiveness, and side effects of any medication; and

       (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the

residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## IV.

## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff alleged she was disabled since August 3, 2004 due to chronic back pain and hearing loss. The ALJ found that Plaintiff had the severe impairments of degenerative disc disease of the lumbosacral spine and obesity; that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of an impairment in the Listings; that Plaintiff's allegations regarding her alleged limitations were not credible; that Plaintiff's RFC for the full range of light sedentary work was reduced by certain limitations; that because of chronic back pain and a history of back surgery Plaintiff would be prevented from performing past relevant work; that there was "no persuasive medical reason why the [Plaintiff] could not perform light work," with the stated limitations; that she retained the ability to perform work other than her past relevant work which existed in significant numbers in the national economy; and that, therefore, Plaintiff was not disabled. In particular, the ALJ found that Plaintiff could perform light work which did not require prolonged or frequent standing or walking, climbing of ropes, ladders or scaffolds, doing more than occasional climbing of ramps and stairs or balancing, stooping, kneeling, crouching, or crawling; which did not require having concentrated or excessive exposure to whole body vibrations or to unprotected heights or dangerous moving machinery; and which did not require doing jobs with unusually high levels of noise exposure, or jobs where normal bilateral hearing would be critical either as a necessity for satisfactory job performance, or as a factor preventing serious injury to either Plaintiff or to others. The ALJ further found that Plaintiff could perform work that did not require "lifting [] more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Tr. 13-14.[3]

---

[3]    The Regulations define light work as 'involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 404.1567(b). Additionally, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251,*6 (SSA).

20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers,

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ did not give proper weight to and/or consider Dr. Beckert's and Dr. Halma's opinion and that of a consulting source; because the ALJ credited the opinion of a agency caseworker, who was not qualified as either a treating or examining source; because the ALJ "usurp[ed]" the role of a medical expert; because the ALJ misstated what Dr. Halma reported; and because the ALJ erred in his determination of Plaintiff's RFC.

A.      The ALJ's Credibility Determination:

Upon discrediting Plaintiff's allegation that she was disabled and upon his giving greater weight to the opinion of some doctors over the opinions of other doctors, the ALJ considered Plaintiff's credibility. As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its

---

and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Indeed, SSR 85-15, 1985 WL 56857, at *5, states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. ... If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." The sitting requirement for the full range of sedentary work "allows for normal breaks, including lunch, at two hour intervals." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (citing SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996)). Additionally the range of sedentary jobs requires a claimant "to be able to walk or stand for approximately two hours out of an eight-hour day. The need to alternate between sitting and standing more frequently than every two hours could significantly erode the occupational base for a full range of unskilled sedentary work." Id. at 997 (citing 1996 WL 374185 at *7). Moreover, SSR 96-9p requires that "the RFC assessment should include the frequency with which an applicant needs to alternate between sitting and standing, and if the need exists, that vocational expert testimony may be more appropriate than the grids." Id. It also states that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of disabled."

judgment for that of the ALJ. Guillams V. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as also more fully set forth above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F. 3d 963, 966 (8th Cir. 1996). In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, upon discrediting Plaintiff, the ALJ considered that Plaintiff never had regular medical treatment and that the treatment she had was "typically" for acute medical problems or alleged problems as they arose. Tr. 15. Seeking limited medical treatment is inconsistent with claims of disabling physical impairment. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997)

("[Claimant's] failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits."); Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [Plaintiff] would have sought regular medical treatment."); Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). In some circumstances, failure to seek medical treatment based on inadequate financial resources may explain a plaintiff's failure. See Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). In a letter, dated June 3, 2008, and addressed "to whom it may concern," Plaintiff stated that she could not afford doctor bills, prescriptions, and co-payments. Plaintiff further stated that when she "could afford [prescription pain pills] which wasn't very often [she] would get refills for the Hydrocodone and try to make it last till [she] was able to get money." Tr. 186. Plaintiff testified, however, before the ALJ, that since she was off from work she had her husband's insurance. Tr. 50. In regard to Plaintiff's receiving treatment for acute conditions when they arose, the court notes that, following Plaintiff's injury at work on August 2, 2004, she presented to Dr. Beckert for pain in her lower back the next day; that, on March 11, 2008, Dr. Beckert treated Plaintiff for a urinary tract infection; and that, when Plaintiff saw Dr. Beckert, in July and February 2007, it was for bladder and abdominal pain, in addition to back pain. Moreover, Plaintiff saw Dr. Beckert on May 6, 2008, for an evaluation Plaintiff and preparation of a medical statement regarding Plaintiff's Social Security disability claim; in February 2006, Plaintiff saw Dr. Levy for a workers compensation evaluation; when Plaintiff saw Dr. Tate in December 2006, it was for an evaluation, and not treatment; and when Plaintiff saw Dr. Halma in September 2008, it was for a disability evaluation. As such, the court finds that substantial evidence supports the ALJ's finding regarding the reasons

Plaintiff was seen by doctors and that the ALJ's decision, in this regard, is consistent with the case law and Regulations.

Second, the ALJ considered that Plaintiff had no surgery or inpatient hospitalizations since her back surgery in 1997 or 1998, and no physical therapy since 2003, "both before her alleged onset date of disability." Tr. 15. The court finds that the ALJ's decision, in this regard, is based on substantial evidence and that it is consistent with the case law and Regulations. See Edwards, 314 F.3d at 967; Gwathney, 104 F.3d at 1045; Rautio, 862 F.2d at 179 (holding that failure to seek aggressive treatment is not suggestive of disabling pain).

Third, the ALJ considered that Plaintiff had not suffered significant adverse side effects from medications and that when she had such effects they were eliminated, or at least greatly diminished, by changes in her medication. Tr. 15. As set forth above, Plaintiff frequently had her medications, including Hydrocondone-Acetaminophen, renewed. Additionally, Plaintiff's 2003 physical therapy significantly improved her condition. Conditions which can be controlled by treatment are not disabling. See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Estes, 275 F.3d at 725; Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. The absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention [the claimant's] having side effects from any medication."); Richmond v. Shalala, 23 F.3d

1441, 1444 (8th Cir. 1994). The court finds, therefore, that the ALJ's decision in this regard is supported by substantial evidence and that it is consistent with the case law and Regulations.

Fourth, the ALJ considered that, to the extent Plaintiff's daily activities are restricted, they were restricted "much more so by her choice," rather than by medical proscription. Tr. 15. The court notes that Plaintiff testified that she tried to help her daughter with household chores; that, during the day Plaintiff watched television and read the newspaper; that she went to her mother's house every day; and that she could comb her hair and tie her shoes. Tr. 38-41. While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, a plaintiff's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). The court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit her complaints of debilitating pain. The court further finds that substantial evidence supports the ALJ's decision in this regard.

Fifth, the ALJ considered that Plaintiff had an "good to excellent work record up to and including her alleged onset date." The ALJ noted, however, that this is just one factor to consider when assessing credibility. Tr. 14. Indeed, a long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. Allen v. Califano, 613 F.2d 139, 147 (6th Cir. 1980). The court finds that the ALJ properly considered Plaintiff's work record and that his decision in this regard is supported by substantial evidence.

## B.    Dr. Halma's Opinion:

As noted by the ALJ, Dr. Halma saw Plaintiff in September 2008 on a consultive basis and completed a RFC form on which she indicated that Plaintiff had a "number of very extensive" limitations. Tr. 13.  Plaintiff argues that the ALJ erroneously found that Dr. Halma guessed or relied on Plaintiff's complaints of pain.  Plaintiff notes that Dr. Halma may have listened to Plaintiff's complaints of pain, but argues that Dr. Halma described in great detail his examination of Plaintiff. For the following reasons, the court finds that the ALJ gave proper weight to Dr. Halma's opinion and that the ALJ's consideration of Dr. Halma's opinion is based on substantial evidence.

First, the court notes that Dr. Halma was not a treating doctor.  As such, his opinion is not controlling. See Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000); Chamberlain, 47 F.3d at 1494 ("Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician.").

Second, the ALJ considered that some of the complaints which Plaintiff made to Dr. Halma were not made to any other doctor.  Although Plaintiff told Dr. Halma she had migraines for the past two years and that these migraines caused nausea and vomiting, Plaintiff's medical records do not reflect that she complained of migraines to any other doctor.

Third, the ALJ did include, in Plaintiff's RFC, some of the limitations imposed by Dr. Halma. In this regard, Dr. Halma reported that Plaintiff could follow commands and understand conversational voice without difficulty; that her fine motor coordination was intact; that her shoulder and elbow strength and finger flexion were 5/5; that her grip was 4/5; and that Plaintiff should never be exposed to unprotected heights or vibrations, and occasionally tolerate humidity. See Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006) (holding that the limitations imposed by the ALJ as

reflected in the claimant's RFC demonstrating that the ALJ gave some credit to the opinions of the treating physicians"); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("In assessing [the claimant's] RFC, the ALJ determined that [the claimant] could sit for a total of six hours and stand for a total of two hours, but was limited to sedentary work. This in itself is a significant limitation, which reveals that the ALJ did give some credit to [the treating doctor's] medical opinions.").

Fourth, the ALJ considered that many of the limitations found by Dr. Halma were based on Plaintiff's subjective reporting. An ALJ is entitled to give less weight to a doctor's opinion when it is based largely on the plaintiff's subjective complaints rather than on objective medical evidence. See 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ was entitled to give less weight to the opinion of a treating doctor where the doctor's opinion was based largely on the plaintiff's subjective complaints rather than on objective medical evidence) (citing Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005)). See also Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007); Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that the weight given to a medical opinion is dependent on whether it is based on sufficient medical data). As such, the court finds that the ALJ properly considered that many of the limitations found by Dr. Halma were based on Plaintiff's subjective reporting and that the ALJ's decision, in this regard, is based on substantial evidence.

Fifth, as noted by the ALJ, many of the limitations imposed by Dr. Halma were inconsistent with records of other doctors of record. For example, Dr. Tate, an orthopedic specialist, reported that Plaintiff had normal gait, no cervical or lumbar spine muscle spasms, a negative straight leg raise, and no sign of impingement. Also, Dr. Tate reported that Plaintiff's complaints of pain were

disproportionate to the objective medical findings and that Plaintiff could perform work which did not require her to lift more than forty pounds. Dr. Levy reported that Plaintiff had normal gait and that her joints moved with a normal range of motion. Significantly, November 2006 x-rays showed minor arthritic changes and no fractures. Tr. 201. The court finds, therefore, that the ALJ gave proper weight to Dr. Halma's opinion and that the ALJ's decision in this regard is supported by substantial evidence.

### C.    Dr. Beckert's Opinion:

Plaintiff contends that the ALJ improperly dismissed the medical opinion of Dr. Beckert, a treating physician, when the ALJ asserted that Dr. Beckert was not sure of his opinion "or that Dr. Beckert "made his opinion during a period when [Plaintiff's] pain was exacerbated." Plaintiff further contends that, "while Dr. Beckert suggest[ed] that a complete workup would be of benefit, he [did] not hesitate in his opinion as to [Plaintiff's] limitations. Doc. 11 at 8.

The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch, 201 F.3d at 1012-13 (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Leckenby, 487 F.3d at 632 (8th Cir. 2007); Chamberlain, 47 F.3d at 1494; 20 C.F.R. §404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source

presents relevant evidence, such as medical signs, in support of his or her opinion). "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). See also Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is giving controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). For the following reasons, the court finds that the ALJ did not err in regard to his consideration of Dr. Beckert's records and findings.

First, the ALJ further considered that although Plaintiff told Dr. Beckert in August 2004 that she left her casino job due to increasing back pain, an October 2004 x-ray showed only post-surgical changes and minimal degenerative disc disease. See Leckenby, 487 F.3d at 632; Chamberlain, 47 F.3d at 1494.

Second, as discussed above, the ALJ considered that there were gaps in Plaintiff's visits to Dr. Beckert. In this regard, the ALJ considered that, on December 22, 2004, Dr. Beckert administered a steroid injection to Plaintiff and that Plaintiff did not see Dr. Beckert again until September 23, 2005. See Gwathney, 104 F.3d at 1045.

Third, the ALJ considered that, on multiple occasions, when Plaintiff saw Dr. Beckert or his partner, it was for minor or acute illnesses that did not result in long term limitations. In this regard, when Plaintiff saw Dr. Beckert, in September 2005, she had multiple vague complaints; that when Plaintiff saw Dr. Beckert or his partner, in July 2007, it was for an allergic reaction; that when she

saw Dr. Beckert or his partner, in February and March 2008, it was for a urinary tract infection; and that when she saw Dr. Beckert or his partner in February 2008, it was for acute cystitis.

Fourth, concerning Plaintiff's May 6, 2008, visit to Dr. Beckert, the ALJ considered that Plaintiff said "she wanted papers filled out that would say that she was disabled due to chronic back pain." The Eighth Circuit has held that an ALJ may discount a claimant's subjective complaints for, among other reasons, that he appeared to be motivated to qualify for disability benefits. Eichelberger, 390 F.3d at 590 (holding that although the ALJ found that the claimant had objectively determinable impairments, the ALJ properly considered that the claimant's incentive to work might be inhibited by her long-term disability check of $1,700 per month); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir.1996) (holding that the ALJ to judge properly considered a strong element of secondary gain upon discrediting the claimant). As such, the court finds that the ALJ's decision in this regard is supported by substantial evidence and that it is consistent with the case law and Regulations.

Fifth, the ALJ also considered that, on May 6, 2008 Dr. Beckert completed a form, listing a number of very severe functional restrictions for Plaintiff, including that she could not work more than one hour a day and that she had the need to elevate her legs during the day. The ALJ further considered that Dr. Beckert stated on the form that, in his opinion, Plaintiff was unemployable, although Plaintiff needed a further work-up before that could be determined with finality. A treating physician's checkmarks on a form, however, are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan 239 F.3d at 961; Social Security Ruling 96-2p, (July 2, 1996). Moreover, a treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). A brief, conclusory letter

from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). As such, the court finds that the ALJ properly considered that Dr. Beckert stated on a form that Plaintiff had functional limitations and that she could not work, and that the ALJ's decision in this regard is supported by substantial evidence.

Sixth, the ALJ considered that Dr. Beckert's findings were not supported by the medical record as a whole. "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes, 275 F.3d at 725 (internal quotation marks omitted). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958 at 961. The ALJ considered that, in February 2006, Dr. Levy performed a physical examination of Plaintiff for purposes of her worker's compensation claim and reported that Plaintiff no limited range of motion in any spinal or joint area; that Plaintiff had no signs of muscle spasms, weakness, atrophy, neurological deficit, or nerve root compression; and that Plaintiff had a 20% permanent partial disability for worker's compensation purposes for each of her back injuries. Tr. 12. As discussed above, Dr. Levy reported that Plaintiff had *normal gait*; that she was able to walk on her heels and toes without difficulty; that she could *squat without difficulty*; there was *no obvious deformity* in Plaintiff's back; that Plaintiff no *loss of motion on lateral bending and rotation*; that "there [was] *moderate discomfort* on motion of her back"; and that Plaintiff's sensory examination was normal.

The court notes that, on June 10, 2007, Dr. Levy viewed Plaintiff's MRI and revised his worker's compensation assessment to a 20% permanent partial disability of the woman as a whole.[4]

Upon his not giving controlling weight to Dr. Beckert's opinion, the ALJ also considered that, on December 6, 2006, Dr. Tate conducted an independent medical evaluation of Plaintiff for worker's compensation purposes and that Dr. Tate was an orthopedist. As discussed above, the ALJ considered that Dr. Tate reported that Plaintiff's complaints were disproportionate to the medical findings, where "were nearly all negative"; that Dr. Tate's opinion was consistent with Dr. Levy's opinion; and that Dr. Tate opined that Plaintiff should be able to perform a full-time job which did not require frequent lifting or carrying of more than 40 pounds. Tr. 12-13. The court notes that Dr. Tate reported that Plaintiff had 4/5 muscle strength in the lower extremities and 5/5 in the shoulders and elbows; that there was "no anatomic basis and sensation is in a non-dermatomal, non-peripheral nerve distribution"; that Plaintiff had a normal gait; and that Plaintiff had no coordination deficits. Dr. Tate specifically reported that Waddell symptom magnification indicators were positive for increased pain with en bloc rotation, increased pain with axial loading, diffuse tenderness, distraction maneuvers and pain out of proportion to objective findings. The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998) (citation omitted). The ALJ, therefore, gave proper weight to Dr. Tate's opinion. The court further finds that the ALJ's determination that Dr. Beckert's findings were not supported by the medical record as a whole is supported by substantial evidence and that the ALJ's decision, in this regard is supported by substantial evidence.

---

[4]     The ALJ mistakenly stated that Dr. Levy revised his diagnosis on June 10, 2007, to 45%. Tr. 13.

Seventh, the ALJ did incorporate, in his RFC determination, some of the limitations imposed by Dr. Beckert, including Dr. Beckert's opinion that Plaintiff can only occasionally bend, stoop, and balance; that Plaintiff should not work around dangerous machinery; and that Plaintiff should not work in jobs where bilateral hearing would be critical. See Choate, 457 F.3d at 869-70; Ellis, 392 F.3d at 994.

Indeed, the ALJ considered, in great detail, Dr. Beckert's records and findings. The court finds that the ALJ gave proper weight to all medical opinions of record, including that of Dr. Beckert; that the ALJ's consideration of the medical evidence, as a whole, is based on substantial evidence; and that the ALJ's resolution of the conflicts among the various treating and examining physicians is based on substantial evidence. Tindell v. Barnhart, 444 F.3d at 1004.

### D. Non-Examining Source's Opinion:

Plaintiff contends that the ALJ did not consider the "nonexamining source consulted by Disability Determinations" who "opined that a proper RFC would be sedentary with standard low back restrictions." Doc. 11 at 8-9. Indeed, a handwritten note in the record, signed by a doctor whose name is not legible, states, "advise sed RFC with standard back." This note is otherwise not legible. Tr. 265.

An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted ... [and][a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (internal citations omitted); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). Even assuming, arguendo, that the ALJ

did not consider the non-examining source's opinion, the court finds that, if considered, this opinion would not have had an effect on the outcome of this matter. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); See also Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) ("The fact that the ALJ did not elaborate on this conclusion does not require reversal, because the record supports her overall conclusion."). Therefore, the failure of the ALJ to specifically address the non-examining source's opinion does not require reversal.

### E.    State Agency Case Worker:

Plaintiff contends that the ALJ endorsed the opinion of a case worker who does not qualify as an acceptable medical source and that the ALJ "substitute[d] the opinions of a caseworker for those of each and every doctor who ha[d] either treated or examined [Plaintiff]." Doc. 11 at 9.

As set forth above, K. Bax, a State agency medical consultant, completed a Physical RFC Assessment. The court finds that the ALJ's decision does not reflect that the ALJ endorsed K. Bax's opinion as that of an acceptable medical source or that the ALJ substituted K. Bax's opinion for that of other medical sources. While K. Bax's assessment of Plaintiff's abilities is consistent with the ALJ's conclusions regarding Plaintiff's limitations, the ALJ made his own RFC determination based on the record as a whole. As such, the court finds without merit Plaintiff's contention that the ALJ gave improper weight to the opinion of K. Bax.

### B.    The ALJ's RFC Determination is Supported by Substantial Evidence in the Record

As stated above, the ALJ found that Plaintiff can perform "light work not requiring prolonged or frequent standing or walking; climbing of ropes, ladders or scaffolds; doing more than occasional climbing of ramps and stairs or balancing, stooping, kneeling, crouching, or crawling; having

concentrated or excessive exposure to whole body vibrations or to unprotected heights or dangerous moving machinery; or doing jobs with unusually high levels of noise exposure, or jobs where normal bilateral hearing would be critical either as a necessity for satisfactory job performance, or as a factor preventing serious injury to either [Plaintiff] or to others" or perform work that does not require "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Tr. 13-14. Plaintiff contends that the ALJ's determination of Plaintiff's RFC is not supported by any evidence in the record. In particular, Plaintiff argues that the ALJ disregarded Dr. Beckert's and Dr. Halma's RFC assessments upon reaching his RFC determination and that the ALJ's RFC assessment is "speculation" based "only upon his assumption that the reports of Beckert and Halma were not objective." Doc. 15 at 1.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer, 245 F.3d at 703. "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney, 228 F.3d at 863). See also Anderson v. Shalala, 51 F.3d 779 (8th Cir. 1995). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'some medical evidence,' Dykes v. Apfel, 223

F.3d 865, 867 (8th Cir.2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

For the following reasons the court finds that the ALJ's RFC determination is supported by substantial evidence in the record. First, the court has found, above, that the ALJ gave proper weight to the opinions of Dr. Halma and Dr. Beckert. Second, the court finds that the medical evidence, including the findings of Dr. Tate, as discussed above, supports the ALJ's determination of Plaintiff's RFC. See Tucker, 363 F.3d at 783; Lauer, 245 F.3d at 704. Third, upon determining Plaintiff's RFC, the ALJ considered Plaintiff's credibility. Fourth, the ALJ assessed Plaintiff's work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737. Pursuant to this requirement, the ALJ imposed functional limitations upon Plaintiff's ability to perform the full range of light work. Fifth, the ALJ's determination of Plaintiff's RFC is precise as it directly addresses her restrictions and the requirements of light work. Sixth, the ALJ's assessment of Plaintiff's RFC is based upon and is consistent with all of the relevant evidence. See McKinney, 228 F.3d at 863 ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations") (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995).

The court finds that the ALJ did not substitute his opinion for that of any source of record, including the opinions of treating, examining, and consulting doctors, or medical sources and consultants. Rather, the ALJ evaluated the record as a whole upon determining Plaintiff's RFC. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) ("It is the ALJ's function to resolve conflicts

among the various treating and examining physicians.").  As such, the court finds that the ALJ's determination of Plaintiff's RFC is based on substantial evidence and that it is consistent with the Regulations and case law.

## V.

## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint is **DENIED**; Docs. 1, 11.

**IT IS FURTHER ORDERED** that a separate judgement issue incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler

MARY ANN L. MEDLER

UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of September, 2010.